UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------X
                                              :
MICHAEL JONES,                                :
                                              :
                              Plaintiff,      :
                                              :
                  - against -                 :
                                              :
                                              :
CITY OF NEW YORK, et al.,                     :
                                              :
                              Defendants.     :
                                              :
----------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __4/2/2020__

18-CV-1937 (VSB)

<u>**OPINION & ORDER**</u>

<u>Appearances</u>:

Michael Jones
Ossining, NY
*Pro se Plaintiff*

Sharon Vicky Sprayregen
New York City Law Department
New York, NY
*Counsel for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       Plaintiff Michael Jones brings this action pro se pursuant to 42 U.S.C. § 1983 against

Defendants the City of New York (the "City"); Joseph A. Ponte ("Ponte"), the former

Commissioner of the Department of Correction; Corizon Health, Inc. ("Corizon"); Doctor

Rotislav Davydov ("Davydov"); Doctor Olga Segal ("Segal"); and ten John and Jane Doe

correction officers and captains ("Doe Defendants"), asserting claims of deliberate indifference

to his medical needs under the Eighth Amendment and violation of his First Amendment right to

freedom of religion.  Before me are (1) a motion for judgment on the pleadings filed by

Defendant Segal, and (2) a motion for judgment on the pleadings filed by Defendants New York

City, Corizon, Davydov, and Ponte (together, the "City Defendants"). Defendant Segal's motion is DENIED. The City Defendants' motion is GRANTED IN PART and DENIED in part. It is granted with respect to Plaintiff's Eighth Amendment claim against Defendant Ponte and denied in all other respects.

## I.   **Factual Background**[1]

Plaintiff is currently incarcerated at Sing Sing Correctional Facility in Ossining, NY. (Compl. ¶ 5A.)[2] Since 1990, Plaintiff has been in the custody of the New York State Department of Corrections and Community Supervision ("DOC"). (*Id.* ¶ 15.) At the time of most of the events Jones relates in his Complaint, he was housed at various correctional facilities on Rikers Island. (*Id.* ¶¶ 9–10, 15.) Corizon was contracted by the DOC to provide medical services to inmates confined in New York City correctional facilities, such as Plaintiff. (*Id.* ¶ 13.)

In 2006, Plaintiff underwent a back surgery that involved a decompressive laminectomy and foraminotomy, excision of herniated discs, and fusion of certain vertebrae in his lumbar spine. (*Id.* ¶ 16; Pl.'s Opp. Ex. C, Doc. 64, at 21.)[3] As a result of that surgery, he is required to sit and lie on a special mattress to relieve pressure on his lumbar spine. (*Id.* ¶ 17.)

---

[1] The following factual summary is drawn from the allegations contained in Plaintiff's Complaint Pursuant to 42 U.S.C. §1983 ("Complaint"), (Doc. 2), and Plaintiff's memorandum of law in opposition to Defendants' motions to dismiss along with the documents attached thereto, (Doc. 62). *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (on a Rule 12(c) motion, "the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case" (internal quotation marks omitted)); *Henning v. N.Y.C. Dep't of Corr.*, 14-CV-9798 (JPO), 2016 WL 297725, at *3 (S.D.N.Y. Jan. 22, 2016) ("Although this allegation appears in his opposition papers, the Court—consistent with its duty to liberally construe pro se pleadings—will credit Plaintiff's assertion in evaluating the sufficiency of his complaint."). I assume the allegations set forth in Plaintiff's submissions to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Compl." refers to Plaintiff's Complaint, filed on the electronic docket on March 2, 2018. (Doc. 2.)

[3] "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in opposition to Defendants' motions for judgment on the pleadings, filed on the electronic docket on June 25, 2019. (Doc. 62.) The exhibits to Plaintiff's Opposition were docketed as Document 64. Because the exhibits are included consecutively in a single document and are not individually paginated, I cite to each exhibit using the relevant ECF page numbers.

On May 15, 2014, Plaintiff arrived at Robert N. Davoren Center ("RNDC") and requested a special mattress. (*Id.* ¶ 18.)  In support of that request, he told the intake examiner about his prior surgery and provided copies of medical records relating to his condition, including the 2006 report of his surgeon stating that he needed a special mattress. (*Id.* ¶ 18; Pl.'s Opp. 9; *id.* Exs. C–F.)  The examiner told Plaintiff that Rikers Island and Corizon policy prohibited the issuance of a special mattress. (Compl. ¶ 18.)  Plaintiff was then provided with "a worn down used mattress approximately one inch in thickness with rips in it causing the insulation to come out." (*Id.* ¶ 19.)  As a result, Plaintiff began to experience "extreme lower and upper back pain, stiffness in his lower back, muscle spasms, shoulder pain, loss of sleep, numbness in his hipbones, and difficulty standing." (*Id.* ¶ 20.)

Subsequently, from May 19, 2014 through July 2, 2014, Plaintiff visited sick call at RNDC on seven occasions and informed the medical staff on duty about the pain being caused by his mattress. (*Id.* ¶¶ 21–25.)  On each occasion, Plaintiff reports, he was told that Rikers and Corizon policy prohibited the issuance of a special mattress. (*Id.*)  One staff member provided Plaintiff with ibuprofen, but others did not. (*Id.*)

On August 7, 2014, Plaintiff was transferred to the George Motchan Detention Center ("GMDC") where he was again given "a worn down used mattress approximately one inch in thickness with rips in it causing the insulation to come out." (*Id.* ¶ 26.)  From August 26, 2014 through March 23, 2015, Plaintiff visited GMDC medical staff nineteen times and reported that his mattress was causing pain in his back, shoulder, and neck, and informed the staff about his prior surgery. (*Id.* ¶¶ 27–37, 39.)  Each time, the staff member told him Rikers and Corizon policy prohibited the issuance of a special mattress.  Plaintiff had the same experience when he visited Defendant Davydov on April 5, 2015, and when he visited Defendant Segal on April 16,

2015 and December 30, 2015.  (*Id.* ¶¶ 38–39.)

On April 14, 2015, Plaintiff was set to appear in court.  (*Id.* ¶ 43.)  That morning, GMDC personnel conducted a strip and cavity search and had Plaintiff walk through a metal detector before transferring him to a holding pen, (*id.* ¶ 44), which was situated three feet from an officer's desk, in full view of eight to ten correction officers and captains, (Pl.'s Opp. 11.).  Plaintiff and the other inmates then boarded a bus.  (*Id.* ¶ 44.)  The bus stopped at a "search facility."  (*Id.*)  A John Doe Captain and three John Doe Officers boarded the bus wearing black uniforms and gas masks, and armed with canisters of MK9, a chemical agent.  (*Id.* ¶¶ 44–45.)  These officers did not have identification tags.[4]  (*Id.* ¶ 45.)  The Captain yelled:  "listen up, I want all you mother fuckers off the bus now.  If you give my officers or me any shit, we will spray your ass until you fall out.  Stand up walk straight off the bus and do not look back or say a word.  This is the new policy handed down from the Commissioner."  (*Id.*)

Plaintiff and the other passengers exited the bus and saw additional John Doe officers dressed in the same way as the ones who had boarded the bus.  (*Id.* ¶ 46.)  Plaintiff and the other inmates were directed to stand side by side, shackled to one another.  (*Id.* ¶ 47.)  A Jane Doe officer led a drug-sniffing dog up and down the line of inmates while another Jane Doe officer took video.  (*Id.*)  Plaintiff was then directed to enter a "large open cage," where he was unshackled and ordered to strip.  (*Id.* ¶ 48.)  Plaintiff told the officers that he was Jewish and "was not supposed to disrobe in the presence of other inmates."  (*Id.* ¶ 48.)  The officer stated that "this was the new policy" and proceeded to conduct a cavity search of Plaintiff by telling Plaintiff to "place his hands on top of his head, spread his legs and bend over and cough five

---

[4] Since the participants were not wearing identification tags, it is not clear how Plaintiff was able to identify the ranks of officers involved in this incident; however, it appears that Plaintiff may be assuming the ranks of the officers involved in the incidents based upon their level of involvement in the incidents and whether or not they gave instructions to others.

times, open his mouth, and run his hand between his lips, turn around and place his hand against the gate, lift up his left and right foot."   (*Id.* ¶ 49.)  Another officer, wearing a mask and holding a canister of MK9, told Plaintiff "if you fail to comply or say anything, I will spray you in your face."  (*Id.* ¶ 50.)

On April 22, 2015, Plaintiff had another court appearance.  (*Id.* ¶ 51.)  On the return trip to GMDC, the bus Plaintiff was on was stopped at a search facility, and several John Doe captains and officers, dressed in black, with no identification tags and armed with MK9, boarded the bus.  (*Id.*)  One captain said "you guys know the drill, stand up and don't say a word.  Get the fuck off the bus in a straight line.  This is a new policy, if there is any shit, you will be sprayed." (*Id.*)  Subsequently, Plaintiff alleges, the exact same chain of events took place as they did on April 15, 2015.  (*Id.* ¶¶ 52–55.)  He was also inspected by a handheld metal detector.  (Pl.'s Opp. 11.)  When the bus returned to GMDC, Plaintiff was "subjected to another full body cavity strip-frisk-search upon entering the facility."  (*Id.* ¶ 56.)

Finally, Plaintiff alleges that Defendant Ponte, then the Commissioner of the New York City Department of Corrections, instituted a policy of illegal strip searches, entered into the contract with Corizon, and failed to train his staff.  (*Id.* ¶ 12.)

## II.    <u>Procedural History</u>

Plaintiff commenced this action on February 24, 2018 by giving his Complaint to prison officials to mail out (Doc. 2), along with a request to proceed in forma pauperis ("IFP") and a prisoner authorization form, (Docs. 1, 3).  These documents were filed on the electronic docket on March 3, 2018.  In his Complaint, Plaintiff asserted claims under 42 U.S.C. § 1983 of (1) "violation of his serious medical needs; cruel and unusual punishment;" (2) "failure to

provide adequate and wholesome food[5]; cruel and unusual punishment"; and (3) "illegal strip/cavity search/religious violation," against twenty-seven defendants, including the medical staff he met with at RNDC and GMDC, ten correction officers and captains, the City of New York, Ponte, and a food service administrator.  (*See generally* Doc. 2.)  On May 15, 2018, I issued an order granting Plaintiff's IFP application, (Doc. 8), as well as an Order of Service evaluating Plaintiff's Complaint pursuant to my authority under 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b), (Doc. 7).

In the Order of Service, I observed that the statute of limitations for § 1983 claims is three years, so only claims that arose after February 24, 2015, three years prior to the date Plaintiff gave his Complaint to prison officials, would be timely.  I dismissed as untimely the claims against fifteen individual Rikers/Corizon medical staff members without prejudice to refiling those claims with allegations showing Plaintiff would be entitled to equitable tolling of the limitations period.  (Doc. 7, at 2–3.)  Because Plaintiff alleged that he had met with Davydov on April 5, 2015, and with Segal on April 16, 2015 and December 30, 2015, I did not dismiss them from the action.  (*Id.* at 4 n.3.)

Finally, I directed the United States Marshal Service to assist Plaintiff in serving the remaining named Defendants, and, pursuant to *Valentin v. Dinkins*, 121 F.3d 72, 76 (2d Cir. 1997), directed the New York City Law Department to assist Plaintiff in identifying the various John and Jane Doe defendants. (*Id.* at 5–6.)  The City Defendants then requested and received two extensions of time to respond to the Complaint and comply with the *Valentin* order.  (Docs. 15–16, 19–20).  Defendant Segal filed her answer on September 13, 2018.  (Doc. 23.)

On October 1, 2018, the City Defendants submitted a letter informing Plaintiff and the

---

[5] This claim was dismissed in my May 15, 2018, Order of Service.  (Doc. 7.)

Court that after a diligent search, they had been unable to locate records sufficient to identify the Doe Defendants.  (Doc. 27.)  On October 14, 2018, Plaintiff submitted a letter disputing the City Defendants' assertion that he had not provided enough information to identify the officers.  (Doc. 28.)  On November 13, 2018, the City Defendants filed their answer.  (Doc. 30.)

On January 10, 2019, I held a pretrial conference in this matter, and on February 27, 2019, I entered a case management plan and scheduling order.  (Doc. 48.)  After Defendants requested and received several extensions of the discovery deadlines, fact discovery closed on February 21, 2020, all discovery closed on March 18, 2020, and a post-discovery conference is scheduled for April 9, 2020.  (*See* Docs. 83, 91.)

On January 11, 2019, Defendant Segal filed a motion for judgment on the pleadings along with a declaration, affirmations, and a memorandum of law in support.  (Docs. 36–40.) After requesting and receiving an extension of time to file their motion, the City Defendants filed a motion for judgment on the pleadings and memorandum of law on April 5, 2019.  (Doc. 53.) On June 25, 2019, Plaintiff filed his opposition, with a memorandum of law and exhibits, including various medical records and other documents not filed with his complaint.  (Doc. 61– 62, 64.)  On the same day, Plaintiff also filed a Rule 60(b)(6) motion for reconsideration of my order dismissing the claims that arose outside the statute of limitations period on the ground that he had asserted a continuing violation.  (Doc. 63.)  On July 2, 2019, I issued an order denying that motion—which I treated as a motion to amend his complaint—based on my finding that Plaintiff had not alleged in either his Complaint or his motion any additional facts to support his claim that any of the Dismissed Defendants individually committed any "non-time-barred" wrongful acts that would bring his claims within the ambit of the continuing violation doctrine. (Doc. 67.)  I granted Plaintiff forty-five days "to submit a proposed amended complaint that

alleviate[d] the deficiencies [I] identified . . . by alleging facts showing he [wa]s entitled to

equitable tolling."  (*Id.* at 3.)  Plaintiff submitted an amended complaint on July 19, 2019, (Doc.

68), but because he alleged no new relevant facts, I denied the motion and struck the amended

complaint from the record.  (Doc. 69.)

### III.   **Legal Standards**

#### A.  *Motion for Judgment on the Pleadings*

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay

trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  In deciding a

motion for judgment on the pleadings, a district court must "employ the same standard

applicable to Rule 12(b)(6) motions to dismiss."  *Vega v. Hempstead Union Free Sch. Dist.*, 801

F.3d 72, 78 (2d Cir. 2015).  This means "[a]ccepting the non-moving party's allegations as true

and viewing the facts in the light most favorable to that party," and granting judgment on the

pleadings "if the moving party is entitled to judgment as a matter of law."  *Richards v. Select Ins.

Co., Inc.*, 40 F. Supp. 2d 163, 165 (S.D.N.Y. 1999) (internal quotation marks omitted).

Under Rule 12(c), a party is entitled to judgment on the pleadings "only if it has

established that no material issue of fact remains to be resolved."  *Juster Assocs. v. City of

Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990) (internal quotation marks omitted); *see Sellers v.

M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (noting that judgment on the

pleadings "is appropriate where material facts are undisputed and where a judgment on the

merits is possible merely by considering the contents of the pleadings").  "On a [Rule]

12(c) motion, the court considers 'the complaint, the answer, any written documents attached to

them, and any matter of which the court can take judicial notice for the factual background of the

case.'"  *L-7 Designs*, 647 F.3d at 422 (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir.

2009)).

### B. *Pro Se Litigant*

Even after *Twombly* and *Iqbal,* a "document filed *pro se* is to be liberally construed and . . . must be held to less stringent standards than formal pleadings drafted by lawyers." *Bennett v. City of New York,* 425 F. App'x 79, 80 (2d Cir. 2011) (summary order) (quoting *Boykin v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008)). Accordingly, pleadings of a pro se party should be read "to raise the strongest arguments that they suggest." *Kevilly v. New York*, 410 F. App'x 371, 374 (2d Cir. 2010) (summary order) (internal quotation marks omitted). In addition, the Court may consider allegations that appear in a pro se Plaintiff's opposition papers or other submissions to the court.[6] *See Henning v. N.Y.C. Dep't of Corr.*, 14-CV-9798 (JPO), 2016 WL 297725, at *3 (S.D.N.Y. Jan. 22, 2016) ("Although this allegation appears in his opposition papers, the Court—consistent with its duty to liberally construe *pro se* pleadings—will credit Plaintiff's assertion in evaluating the sufficiency of his complaint."); *Sommersett v. City of New York*, No. 09 Civ. 5916(LTS)(KNF), 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) ("[W]here a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." (citation omitted))

---

[6] The City Defendants request that I ignore Plaintiff's allegations contained in his opposition papers, arguing that the principle that "new allegations of fact or law cannot be raised for the first time in opposition papers . . . holds true for *pro se* litigants." (City Reply 2.) The City Defendants' request ignores my obligation to liberally construe Plaintiff's pleadings, and the authority the City Defendants cite is inapposite. *Id.* (citing *Cohen v. New York*, 481 F. App'x 696, 697 (2d Cir. 2012) (holding that a pro se litigant had waived an issue for appeal by not raising it in the district court below); *Williams v. Rosenblatt Sec. Inc.*, No. 14-CV-4390 (JGK), 2016 WL 4120654 (Jul. 22, 2016) (holding that it was improper for a pro se Plaintiff to attempt add new claims or parties using his opposition papers after having already amended his complaint five times)). Here, Plaintiff's opposition sets forth allegations that clarify and are consistent with the allegations made in his original complaint; they do not introduce entirely new claims or parties.

"City Reply" refers to the Reply Memorandum of Law in Further Support of City Defendants' Motion for Judgment on the Pleadings, filed on August 8, 2019

Nevertheless, dismissal of a pro se complaint is appropriate where a plaintiff fails to state a plausible claim supported by more than conclusory factual allegations. *See Walker v. Schult*, 717 F.3d 119, 124, 130 (2d Cir. 2013). In other words, the "duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal quotation marks omitted).

IV.  **Discussion**

Pursuant to § 1983, Plaintiff asserts an Eighth Amendment claim of deliberate indifference to serious medical needs against Davydov, Segal, and the City, and he asserts First and Fourth Amendment claims against the Doe Defendants, Commissioner Ponte, and the City. Plaintiff also seeks punitive damages. Defendants move to dismiss all claims.

A. *Liability Under Section 1983*

"Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Section 1983 does not establish substantive rights, but it provides a means of redress for the deprivation of rights established elsewhere. *Id.*

Under § 1983, a plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see also Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [§] 1983." (internal quotation marks omitted)). When a prison official is sued, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v.*

10

*Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir.

1985)).  The personal involvement of an individual acting as a supervisor of the primary

wrongdoer may be established by demonstrating that:

> (1) the defendant participated directly in the alleged constitutional violation, (2)
> the defendant, after being informed of the violation through a report or appeal,
> failed to remedy the wrong, (3) the defendant created a policy or custom under
> which unconstitutional practices occurred, or allowed the continuance of such
> a policy or custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference to the rights of inmates by failing to act on information
> indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995).[7]

A municipality or municipal corporation is liable under § 1983 "if the governmental body

itself subjects a person to a deprivation of rights or causes a person to be subjected to such

deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted).

Because the language of § 1983 makes clear that "Congress did not intend municipalities to be

held liable unless action pursuant to official municipal policy of some nature caused a

constitutional tort," a municipality "cannot be held liable *solely* because it employs a tortfeasor."

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (emphasis in original).  In order to

succeed on a claim against a municipality under § 1983, a plaintiff must show:  "(1) actions

taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4)

damages; and (5) that an official policy [or custom] of the municipality caused the constitutional

injury."  *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015) (quoting *Roe*

---

[7] The Second Circuit has not addressed the impact of *Iqbal* on the *Colon* test.  *See Sheldon v. Galant*, No. 18-CV-06320(NSR), 2019 WL 6702137, at *6 (S.D.N.Y. Dec. 6, 2019).  Some district courts have questioned the viability of the second, fourth, and fifth *Colon* factors, *see id.* (collecting cases), but "the majority of courts in this Circuit have continued to apply the *Colon* factors absent contrary instructions from the Court of Appeals," *Harrell v. New York State Dep't of Corr. & Cmty. Supervision*, No. 15-CV-7065(RA), 2019 WL 3821229, at *7 (S.D.N.Y. Aug. 14, 2019).  I agree with Judge Ronnie Abrams' assessment in *Harrell* that *Colon* is "good law" and accordingly apply the test here.  *Id.*

*v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)).

To satisfy the requirement of an official policy or custom, a plaintiff must allege either "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). A plaintiff cannot show a "policy" or "custom" sufficient to impose municipal liability merely by providing "[p]roof of a single incident of unconstitutional activity . . . unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–824 (1985); *see also Cowan*, 95 F. Supp. 3d at 637 ("Generally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (internal quotation marks omitted)).

Further, the causation prong demands that a plaintiff "prove a causal link between the policy, custom or practice and the alleged injury in order to find liability against a municipality." *Brandon*, 705 F. Supp. 2d at 277; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

### B. *Eighth Amendment Claim of Deliberate Indifference*

#### 1. Applicable Law

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "Although the Constitution does not require comfortable prison conditions,

the conditions of confinement may not involve the wanton and unnecessary infliction of pain."
*Walker,* 717 F.3d at 125 (internal quotation marks omitted).  To state an Eighth Amendment
"conditions of confinement" claim, a plaintiff must provide proof of two prongs:  first, that
objectively, the deprivation [he] suffered was "sufficiently serious that he was denied the
minimal civilized measure of life's necessities," and second, that subjectively, the defendant
official acted with "deliberate indifference" to his health or safety.  *Id.* (internal quotation marks
omitted).

To satisfy the objective prong, a plaintiff "must show that the conditions . . . pose[d] an
unreasonable risk of serious damage to his health."  *Id.*  Where a plaintiff alleges he was
deprived of medical care, he must demonstrate that (1) he "was actually deprived of adequate
medical care," and (2) the "inadequacy in medical care [wa]s sufficiently serious." *Benjamin v.
Pillai*, 794 F. App'x 8, 11 (2d Cir. Nov. 6, 2019) (quoting *Salahuddin v. Goord*, 467 F.3d 263,
280 (2d Cir. 2006)).  This second inquiry "requires the court to examine how the offending
conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the
prisoner."  *Salahuddin*, 467 F.3d at 280.  The "seriousness" of the medical condition is one factor
in this inquiry, but it is not the only one.  *Id.*  For example:

> If the unreasonable medical care is a failure to provide any treatment for an inmate's
> medical condition, courts examine whether the inmate's medical condition is
> sufficiently serious . . . [but] if the prisoner is receiving on-going treatment and the
> offending conduct is an unreasonable delay or interruption in that treatment, the
> seriousness inquiry focus[es] on the challenged delay or interruption in treatment
> rather than the prisoner's underlying medical condition alone.

*Id.*

Although "[t]here is no settled, precise metric to guide a court in its estimation of the
seriousness of a prisoner's medical condition," the Second Circuit has enunciated the following
non-exhaustive list of factors:  "(1) whether a reasonable doctor or patient would perceive the

13

medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

In light of the facts that "sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment," courts have found that "[t]he condition of . . . [an] inmate's mattress 'may be so inadequate as to constitute an unconstitutional deprivation.'" *Walker*, 717 F.3d at 127; *see also Rodriguez v. City of New York*, No. 15-CV-07945, 2018 WL 1276826, at *4 (S.D.N.Y. Mar. 9, 2018). "To succeed on a claim involving an alleged deficient bed, a plaintiff must allege that [he] had a medical condition requiring a non-standard bed to protect against serious damage to his future health' or 'that the medical condition was itself created by an inadequate bed or mattress.'" *Rivera v. Doe*, No. 16-CV-8809 (PAE) (BCM), 2018 WL 1449538, at *7 (S.D.N.Y. Feb. 26, 2018) (quoting *Patterson v. Ponte*, No. 16 Civ. 3156 (PAE) (JCF), 2017 WL 1194489, at *6 (S.D.N.Y. Mar. 30, 2017)), *report and recommendation adopted*, No. 16 Civ. 8809 (PAE) (BCM), 2018 WL 1441386 (S.D.N.Y. Mar. 22, 2018).

Finally, to satisfy the subjective prong, the plaintiff must demonstrate "deliberate indifference," *Walker*, 717 F.3d at 125, meaning that "the official's state of mind need not reach the level of knowing and purposeful infliction of harm," but it must be "more than mere negligence," *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019). More specifically, the official "must know of and disregard an excessive risk to inmate health or safety; [he or she] must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Farmer*, 511 U.S. 825 at 844). Prison officials who "actually knew of a

substantial risk to inmate health or safety" may ultimately be free of liability if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

### 2. Application

#### a.   Defendants Segal and Davydov

Drawing all inferences in his favor, Plaintiff's allegations satisfy both the objective and subjective inquiries for his claims against Defendants Segal and Davydov.

##### i.   *Objective Prong*

First, Plaintiff meets the objective prong since he has alleged that he had a specific medical condition as a result of a prior surgery that required him to sit or lie on a special mattress to support his lumbar spine.  (Compl. ¶¶ 16–17; Pl.'s Opp. 9.)  At the time of his surgery, the surgeon specifically required him to use such a mattress, (*id.*; Pl.'s Opp. Ex. D), demonstrating that at some point, at least one "reasonable doctor . . . perceive[d] the medical need in question as important and worthy of comment or treatment."  *Brock*, 315 F.3d at 162.  Even years after the surgery, without the mattress, Plaintiff alleges, he experienced "extreme lower and upper back pain, stiffness in his lower back, muscle spasms, shoulder pain, loss of sleep, numbness in his hipbones, and difficulty standing," (Compl. ¶¶ 19–20; *see also* Pl.'s Opp. 8 ("[P]laintiff's inadequate mattress cause[d] extreme chronic back pain . . . [and] extreme prolong[ed] shoulder pain.")  Plaintiff alleges that he was provided with diagnostic imaging and physical therapy several years before the allegations in his Complaint, and that he was provided with pain medication on certain occasions during the time period described in his Complaint, (*see* Pl.'s Exs. E, F, K), but that Defendants Davydov and Segal and others declined to provide him with the mattress he had requested.  (Compl. ¶ 21.)

These allegations are sufficient to demonstrate that he experienced "chronic and

substantial pain" that "significantly affect[ed] daily activities," including standing and sitting,

supporting his assertion that his medical condition was "sufficiently serious," *see Brock*, 315

F.3d at 162 –163, and that a non-standard bed was required to avoid or mitigate the pain alleged

but was not provided to him, *see Arriaga v. Gage*, No. 16-cv-1628 (NSR), 2018 WL 1750320, at

*6 (S.D.N.Y. Apr. 6, 2018) (objective prong of Eighth Amendment claim met where plaintiff's

cane had been confiscated from him even though he had "severe back pain [] result[ing] from []

herniated and bulging discs . . . [which] is associated with extreme pain and leads to

degeneration"); *Rodriguez*, 2018 WL 1276826, at *4 (objective prong of Fourteenth Amendment

claim where plaintiff alleged that "due to 'an injury to the lumbar region of his spine,' he

suffer[ed] from 'diagnosed chronic lower-back pain,'" and requested "a second mattress or a

replacement mattress because the single mattress provided to him caused him . . . exacerbated

[his] pain and discomfort,"); *White v. Schriro*, No. 16 Civ. 6769 (PAE) (JCF), 2017 WL

3268202, at *3–4 (S.D.N.Y. July 31, 2017) (objective prong of Fourteenth Amendment met

where plaintiff alleged that a doctor had recommended he receive a firm mattress but that it was

not provided; he was eventually diagnosed with sciatica as a result of the inadequate mattress;

and he received physical therapy and medication to address the back pain and disrupted sleep

that resulted from the inadequate mattress), *report and recommendation adopted*, No. 16 Civ

6769 (PAE) (JCF), 2018 WL 1384506 (S.D.N.Y. Mar. 16, 2018);[8] *Harris v. Moore*, No. 15 Civ.

1608, 2015 WL 10427865, at *3 (S.D.N.Y. Dec. 3, 2015) (objective prong of Eighth

Amendment claim met where plaintiff's second mattress was taken from him even though he had

---

[8] *Rodriguez* and *White* involved conditions of confinement claims brought by pretrial detainees, which are governed by the Fourteenth Amendment, not the Eighth Amendment.  Both types of claims require satisfaction of the same objective prong, but Fourteenth Amendment claims are governed by a slightly different subjective prong.  *See Walker*, 717 F.3d at 125; *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  Therefore, the holdings in both cases that the objective prong was met is applicable here, even if their findings on the subjective prong are not.

been diagnosed with chronic back pain and "prescribed [] physical therapy and painkillers . . . indicat[ing] [] the seriousness of the condition").

Defendants argue that Plaintiff has failed to "plausibly link" his back pain to his mattress and cite in support four cases in which purportedly similar claims were dismissed.  (*See* Segal Mem. 7–9; City Mem. 6.)[9]  Those cases are not analogous because the plaintiffs there failed to show how the specific alleged deficiency in the mattress caused the specific injury alleged by the plaintiff.[10]  Here, Plaintiff has alleged that he suffers from an impairment of his spine that is exacerbated by sleeping and sitting on the "worn down," "one inch in thickness" mattress he was issued.  (Compl. ¶¶ 16–17.)  These allegations give rise to a plausible, common-sense inference that the standard-issue mattress either exacerbates or causes Plaintiff's chronic and substantial back pain.

Defendant Segal also argues that the medical records submitted by Plaintiff, (Pl.'s Opp. Exs. B, C, D, E, F, K), cut against a finding that any deprivation was "sufficiently serious,"[11] because they do not reflect any complaints of extreme pain or discussion of a

---

[9] "Segal Mem." refers to the Memorandum of Law in Support of Defendant, Olga Segal's Motion to Dismiss, filed on January 11, 2019.  (Doc. 39.)  "City Mem." refers to the Memorandum of Law in Support of City Defendants' Motion for Judgment on the Pleadings," filed on April 5, 2019.  (Doc. 53-1.)

[10] *See Daly v. City of New York*, 16 Civ. 6521 (PAE) (JCF), 2017 WL 2364360 (S.D.N.Y. May 30, 2017), *report and recommendation adopted*, No. 16 Civ. 6521 (PAE) (JCF), 2017 WL 2963502 (S.D.N.Y. July 11, 2017) (no Eighth Amendment claim where mattress was not placed on a foundation as instructed by the product; the instructions were aimed at fire safety and the plaintiffs had failed to link their pain to the lack of foundation); *Nelson v. New York City, N.Y.*, No. 16. Civ. 6354 (PAE) (JCF), 2017 WL 2983885, at *3 (S.D.N.Y. July 12, 2017), *report and recommendation adopted*, No. 16 Civ, 6354 (PAE) (JCF) 2017 WL 3207789 (S.D.N.Y. July 27, 2017) ; *Howard v. City of New York*, No. 12 Civ. 4069(PAE)(JCF), 2012 WL 7050623 (S.D.N.Y. Dec. 20, 2012), *report and recommendation adopted*, No. 12cv40692013 WL 504164 (S.D.N.Y. Feb. 11, 2013) (no Eighth Amendment claim based on similar allegations about a lack of foundation, or on allegation that mattress was too short where plaintiffs did not allege their heights); *Turner v. City of New York*, 16 Civ. 8864 (PAE) (RWL), 2017 WL 6942760 (S.D.N.Y. Dec. 12, 2017), *report and recommendation adopted*, 16 Civ. 8864 (PAE) (RWL), 2018 WL 401513 (S.D.N.Y January 12, 2018) (no Eighth Amendment claim based only on generalized allegations of body pain).

[11] Segal frames this argument in terms of whether Plaintiff's medical condition was "sufficiently serious to trigger Eighth Amendment consideration."  (Segal Reply 4.)  As discussed *supra*, Part IV.B.1, the Second Circuit has made clear that the objective prong is concerned with the seriousness of the *deprivation*; the seriousness of the medical

mattress, and because they show that Dr. Segal "successfully" treated Plaintiff's pain through medication.  (Segal Reply 4.)[12]  Accepting this argument would require drawing inferences against Plaintiff which would be improper in considering Defendants' motions to dismiss.

ii.   <em>Subjective Prong</em>

Plaintiff has also "adequately alleged that defendants knew of and disregarded the excessive risks to his health and safety," <em>Walker</em>, 717 F.3d at 129, by pleading (1) he told Davydov and Segal "about the extreme back, shoulder, neck pain" and numbness, (2) he told them about his prior back surgery and "explained the problems and pain that his mattress was causing," and (3) that in response to Plaintiff's disclosures, Davydov and Segal each separately told him that because of Rikers and Corizon policy they could not issue a special mattress to him. (Compl. ¶¶ 16–19, 38–39.)  Therefore, by "alleging that prison officials knew that the [mattress] was inadequate and likely to inflict pain and suffering, [Plaintiff] has . . . sufficiently pleaded the subjective element."  <em>Phelps v. Kapnolas</em>, 308 F.3d 180, 186 (2d Cir. 2002); <em>see also Walker</em>, 717 F.3d at 129 (finding plaintiff's allegation that he had informed various prison staff that his bed was too narrow but that they took no action, among other allegations, sufficient to demonstrate deliberate indifference); <em>Harris</em>, 2015 WL 10427865, at *4 (subjective prong met where plaintiff with lumbago whose special mattress was confiscated had attempted to show defendants his medical referral, which stated his condition and authorized the additional mattress, but defendants refused to examine the document or return the mattress).

The City Defendants argue that Plaintiff has failed to plead that Davydov "actually knew that denying Plaintiff a special mattress would in fact lead to excessive pain; for example by

---

condition is "only one factor" in that inquiry.  <em>Salahuddin</em>, 467 F.3d at 279.

[12] "Segal Reply" refers to the Reply Memorandum of Law in Further Support of Defendant, Olga Segal's Motion for Judgment on the Pleadings, filed on August 8, 2019.  (Doc. 76.)

pleading that Dr. [Davydov] reviewed medical records recommending a special mattress." (City Mem. 7.)  In the City's view, Plaintiff's description of his symptoms was insufficient to give Davydov the knowledge required to render his mental state sufficiently culpable.  (*Id.*)  But the law does not require a plaintiff to plead that the prison official "actually knew" what would happen as a result of his actions; plaintiff must only plead that the prison official "kn[e]w of, and disregard[ed], an excessive *risk* to inmate health."  *Walker*, 717 F.3d at 125 (emphasis added).  The City Defendants cite to no case law supporting their interpretation of the subjective prong, and I decline to apply it here.

The City Defendants also argue that Plaintiff has not sufficiently pled "that the lack of a special mattress would cause 'serious damage to his future health.'" (City Mem. 8, quoting *Santiago*, 2016 WL 680823, at *2.))  I decline to take such a narrow view of the pleadings.  Construing the complaint liberally, as I must, Plaintiff's allegation of extreme, chronic back pain and numbness as a result of his mattress provided to him plausibly suggests that his lumbar spine was at risk of serious damage, particularly given his prior surgical history.  (Compl. ¶¶ 38–39.)

Finally, Defendant Segal argues that Plaintiff has not sufficiently alleged that she acted with the requisite mental state because the medical records he submitted show that she took reasonable steps to treat Plaintiff's pain, including by prescribing medication, reviewing imaging studies, performing a neurological examination, ordering physical therapy, and following up with orthopedics.  (Segal Reply 5.)  As discussed above, although it was Plaintiff who submitted the medical records, it would not be appropriate at this stage for me to take their contents as fact or to draw from the contents of those records inferences adverse to Plaintiff.  Moreover, as Defendant Segal acknowledges, Plaintiff only submitted documentation of his visit to Dr. Segal on December 30, 2014.  Whatever actions Dr. Segal may have taken on that date do not bear on

her mental state in denying Plaintiff's request for a special mattress on April 16, 2015, March 23, 2015, and December 30, 2015.[13]

        b.   Former Defendants Jessy Liburd, Yves Gauvin, Jorge Villalobos

Finally, after reviewing Plaintiff's Complaint in connection with Defendants' motion, I note that Plaintiff's claims against Jessy Liburd, Yves Gauvin, and Jorge Villalobos may have been dismissed in error because his Complaint alleges that each of those individuals denied him a special mattress on at least one occasion within the statute of limitations, i.e. after February 24, 2015.  (*See* Compl. ¶ 24 (alleging that Plaintiff met with Liburd on June 18, 2014, July 15, 2015, and August 18, 2014); ¶ 24 (alleging that Plaintiff met with Gauvin on September 3, 2014, November 25, 2014, and October 15, 2015); and ¶ 29 (alleging that Plaintiff met with Villalobos on November 18, 2014, January 5, 2015, and March 23, 2015).)  These claims would likely be adequately pled for the same reasons the claims against Segal and Davydov are adequately pled, as the allegations against all five are nearly identical.  However, in the proposed Amended Complaint that Plaintiff submitted, which has since been stricken, Plaintiff revised his allegations as to Gauvin and Liburd, such that he no longer claimed to have met with them on any dates after February 24, 2015.  Specifically, the Amended Complaint alleged that he had met with Gauvin on October 15, 2014, not October 15, 2015, and that he met with Liburd on July 15, 2014, not July 15, 2015.  If Plaintiff's revised allegations are true, any claims arising out of his meetings

---

[13] Defendant Segal also asserts that any claim based on the December 30, 2014 visit must ultimately be dismissed as untimely.  Plaintiff's complaint only alleges that he visited Dr. Segal on December 30, 2015.  To the extent that is a typo, and to the extent that his claims based on the March and April 2015 visits ultimately survive, the 2014 visit might also be an appropriate and timely basis for an Eighth Amendment claim.  Under the continuing violation doctrine, when a plaintiff alleges an ongoing policy of deliberate indifference to serious medical needs as well as "some non-time-barred acts taken in furtherance of that policy," the commencement of the statute of limitations may be delayed until the last act in furtherance of the alleged policy.  *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009).

with Gauvin and Liburd would be outside the statute of limitations.  The Amended Complaint, like the Complaint, did contain the allegation that Plaintiff met with Villalobos on March 23, 2015, which appears to be corroborated by the medical records submitted by Plaintiff as exhibits in connection with the instant motions.  (Pl.'s Opp. Ex. K, Doc. 64, at 72.)

Because of the above-listed discrepancies, I conclude that I do not have sufficient information to decide whether the claims against Gauvin, Liburd, and Villalobos were decided in error, and accordingly direct the parties to provide me with supplemental briefing.  Within thirty (30) days of this Opinion & Order, Plaintiff shall submit a letter informing me whether he seeks to proceed with any or all of his claims against those Defendants specifically, and setting forth the allegations supporting those claims.  Within thirty (30) days of receiving Plaintiff's letter, the City Defendants shall submit a response detailing their positions on:  (1) whether the claims identified by Plaintiff should be reinstated, along with any supporting factual and legal authority; (2) whether, if those claims are reinstated, the New York City Law Department would represent the new defendants; and (3) if the Law Department intends to represent those Defendants, whether they will waive service and whether they need to take any additional discovery.

### c.   Commissioner Ponte

Plaintiff has failed to sufficiently allege an Eighth Amendment claim against Defendant Ponte.  Although Plaintiff states generically that Davydov and Segal told him "that Rikers Island and Corizon Health Inc., policy prohibit[ed] them from issuing any form of special mattress," nowhere in his complaint or his opposition does he allege specifically that Defendant Ponte "participated directly" in the denial of his request, that Ponte was informed of the denial but failed to rectify it, that Ponte personally created the relevant policy, that he was "grossly negligent," or that he "exhibited deliberate indifference to the rights of inmates by failing to act

on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. Accordingly, Plaintiff's Eighth Amendment claim against Defendant Ponte must be dismissed.

### d.   Municipal Liability

Defendants Corizon[14] and the City of New York argue that Plaintiff fails to make any non-conclusory allegations identifying a "municipal policy or custom that caused [his] injury" that would render them liable for any constitutional violations.  (City Mem. 17 (quoting *Bd. of the Cnty. Comm'rs of Bryan Cnty. Oklahoma v. Brown*, 520 U.S. 397, 403 (1997).)

I disagree.  Plaintiff has pled that his injury was the result of a "formal policy officially endorsed by the municipality," *Brandon*, 705 F. Supp. 2d at 276, by alleging that from May 15, 2014 through December 30, 2015, different members of Corizon's medical staff (1) denied his request for a special mattress and (2) told him that "Rikers Island and Corizon Health Inc., policy prohibit[ed] them from issuing any form of special mattress no matter what the problem." (Compl. ¶¶ 16–39.)  Plaintiff's allegation that multiple staff reiterated that a policy constrained them from issuing a special mattress sets his claim apart from the cases in which naked, boilerplate assertions of a custom or policy have been found insufficient.  *See, e.g.*, *Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012); *Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011).

Accordingly, Plaintiff has alleged facts "demonstrate[ing] that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008).

---

[14] Corizon may be treated as a municipal actor for purposes of this lawsuit and Defendants do not argue otherwise. *Grimmett v. Corizon Med. Assocs. of New York*, No. 15-CV-7351 (JPO) (SN), 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017); *Bess v. City of New York*, No. 11 Civ. 7604(TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality.").

Defendants argue that Plaintiff's claim of municipal liability fails because he has made only two relevant allegations within the statute of limitations, both of which pertain only to him. (City Mem. 18.)  First, Defendants provide no authority for the assertion that I may only consider allegations within the statute of limitations in order to identify a municipal policy or custom.  To the contrary, courts regularly look beyond the applicable limitations period to determine whether a municipal policy or custom existed at the time of the constitutional violation.  *Cf. Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) ("[I]t is well established that a municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's acquiescence in a *longstanding* practice or custom . . . ." (emphasis added)).  For example, in *Kucharczyk v. Westchester Cty.*, Judge Kenneth Karas found that where the plaintiff had filed suit in 2014 over an alleged constitutional injury that occurred in 2012, he had sufficiently pled a municipal policy based on a relevant Department of Justice Report published in 2009, about an inspection conducted in 2008.  95 F. Supp. 3d 529, 545 (S.D.N.Y. 2015).

Second, although courts have indeed held that "one man's experience does not make a policy," *McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 385, 401 (S.D.N.Y. 2005), *aff'd in relevant part, vacated on other grounds*, No. 04-4849-CV, 2007 WL 247728 (2d Cir. Jan. 25, 2007), Plaintiff's satisfaction of the "official policy or custom" requirement is not based solely on the fact that he individually was denied a mattress on multiple occasions, but also on his claim that when denying his request, staff explicitly told him that they were required to do so by a formal policy established by Corizon and the City.

### C. *Fourth Amendment Claims of Improper Strip Search*

#### 1. **Applicable Law**

##### a. <u>Strip Searches</u>

"The Fourth Amendment prohibits only unreasonable searches." *Myers v. City of New York*, No. 11 Civ. 8525(PAE), 2012 WL 3776707, at *9 (S.D.N.Y. Aug. 29, 2012) (quoting *Bell v. Wolfish*, 441 U.S. 520, 558 (1979)), *aff'd*, 529 F. App'x 105 (2d Cir. 2013). "In determining the reasonableness of a search, courts must 'consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *Id.* (quoting *Bell*, 441 U.S. at 559). Accordingly, strip searches of prisoners are lawful where they are "reasonably related to legitimate security interests," a determination that is generally within "the province and professional expertise of corrections officials." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012) (citations omitted). Courts have held that a policy of conducting strip searches on the way to and from court appearances is not unconstitutional because it "serve[s] the legitimate penological purpose of preventing contraband from coming into and out of prisons and jails." *Thompson v. City of New York*, No. 16 Civ. 824 (PKC), 2017 WL 1929552, at *2 (S.D.N.Y. May 9, 2017); *see also Pizarro v. Bd. of Correction*, No. 16-cv-2418 (RJS), 2018 WL 3462512, at *5 (S.D.N.Y. July 17, 2018); *Smith v. City of New York*, No. 14 Civ. 5934(JCF), 2015 WL 3929621 (S.D.N.Y. June 17, 2015).

However, a strip search is unconstitutional "if it does not serve a legitimate penological goal, such as if it is meant to intimidate, harass or punish a prisoner." *Lesane v. City of New York*, No. 11 Civ. 2104(HB), 2011 WL 5242721, at *2 (S.D.N.Y. Nov. 3, 2011) (citing *Covino v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992) (holding that verbal and physical abuse accompanying a

strip search supports a finding that the strip search is intended to harass and intimidate)).  In

addition, it is unconstitutional to conduct a second strip search shortly after a first strip search

when the inmate has been supervised for the intervening time and has had no opportunity to

obtain or conceal contraband.  *Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983).  Such a search

serves no legitimate penological or security purpose.  *See Jean-Laurent v. Wilkerson*, 438 F.

Supp. 2d 318, 323 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir. 2012) (finding that plaintiff

stated a claim of unconstitutional strip search where plaintiff "was under constant supervision by

[defendants] from the time of the first strip search to the second" and "he had no opportunity to

acquire contraband").

### b.  Qualified Immunity

Even unconstitutional strip searches may not always give rise to liability.  "The doctrine of

qualified immunity protects government officials performing discretionary functions from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Francis v. Fiacco*, 942

F.3d 126, 139 (2d Cir. 2019).  "To be clearly established, a legal principle must have a

sufficiently clear foundation in then-existing precedent . . . [such] that every reasonable official

would interpret it to establish the particular rule the plaintiff seeks to apply."  *District of*

*Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).  The Supreme Court has repeatedly

cautioned courts "not to define clearly established law at a high level of generality," *Mullenix v.*

*Luna*, 136 S. Ct. 305, 308 (2015), but rather to formulate the relevant legal principle with a "high

degree of specificity" so that it "clearly prohibit the officer's conduct in the *particular*

*circumstances* before him," *Wesby,* 138 S.Ct. at 589–90*.* (emphasis added).  "The principles of

qualified immunity shield an officer from personal liability when an officer reasonably believes

that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The applicability of qualified immunity is a fact-specific inquiry, and may only be established at the motion to dismiss stage if it is "based on facts appearing on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

The Supreme Court has formulated the following two-pronged inquiry:  "[Q]ualified immunity shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Francis*, 942 F.3d at 139.  The district court has discretion to tackle these two prongs in the order it deems appropriate. *Id.* at 139–140.

### 2.  Application

#### a.  The John Doe Officers

Plaintiff's allegations with regard to the incidents of April 14, 2015 and April 22, 2015 are essentially identical.  On April 14, prior to departing for a court appearance, Plaintiff was strip searched at GMDC and then placed in a holding pen in full view of several correction officers three feet away, before being boarded onto a bus.  (Compl. ¶¶ 43, 44; Pl.'s Opp. 10.). On the way to court, the bus stopped at a search facility, where Plaintiff was searched again by officers who "yell[ed] in a threatening manner," shouted profanities, and threatened to spray the inmates with MK9 if they did not comply.  (*Id.* ¶¶ 44–50.)  On April 22, Plaintiff was first strip searched at a search facility, then placed back on a bus and strip searched again upon arrival at GMDC.  (*Id.* ¶¶ 51–56.)  During both incidents, Plaintiff alleges, he "was under constant view of the officer[s]."  (Pl.'s Opp. 10.)  These allegations establish that on two occasions, Plaintiff was subjected to a redundant strip search where he and the other inmates did not have the opportunity

26

to secure contraband in the time since the prior strip search.  *See Hodges*, 712 F.2d at 35;

*Bradshaw v. City of New York*, No. 15 Civ. 4638 (ER), 2018 WL 818316, at \*6 (S.D.N.Y. Feb.

9, 2018) (denying defendant's motion for summary judgment on plaintiff's Fourth Amendment

claim where plaintiff was strip searched twice on the same day, first upon leaving a state

correctional facility on his way to Rikers Island, and second upon leaving Rikers Island for

Bronx Court, and "under continuous surveillance during the period between searches"); *Vasquez*

*v. Williams*, No. 13 Civ. 9127(LGS), 2015 WL 4757657, at \*5 (S.D.N.Y. Aug. 11, 2015)

(denying defendant's motion for summary judgment where plaintiff was strip searched at Rikers

Island and again at Bronx Supreme Court, but was restrained and continuously supervised

between the searches); *Wilkerson*, 438 F. Supp. 2d at 323.  Plaintiff's allegations about the

aggressive and threatening language used by the corrections officers bolster the inference that the

search did not have a legitimate purpose.  *See Covino*, 967 F.2d at 79–80.  This is sufficient to

plead a violation of Plaintiff's Fourth Amendment rights by the Doe Defendants.  *Hodges*, 712

F.2d at 35.

Defendants proffer a number of arguments for dismissal of this claim against the Doe

Defendants, all of which are unavailing.  First, they argue that Plaintiff's allegations are "facially

implausible" and should be disregarded as frivolous.  (City Mem. 5.)  While it may be

implausible that events unfolded in exactly the same way on April 15 and April 22, 2015, "a

complaint cannot be dismissed simply because the court finds the allegations to be improbable or

unlikely," and I do not find plaintiff's allegations to "rise to the level of the irrational or the

wholly incredible," as required for a finding of factual frivolousness.  *Denton v. Hernandez*, 504

U.S. 25, 32–33 (1992).

Next, Defendants argue that correction officers would only have boarded the bus in gas

27

masks with MK9 "in response to information that one of the inmates obtained contraband;" therefore, "it is by no means 'clear that there was <u>no</u> possibility that [plaintiff] could have obtained and concealed contraband.'"  (City Mem. 11) (emphasis in original)).  This argument asks that I assume facts that are not alleged in the complaint and to draw inferences against Plaintiff, neither of which is permissible at the motion to dismiss stage.

Third, Defendants argue that Plaintiff's claim against the Doe Defendants should be dismissed because he has failed to name them.  But courts routinely resist dismissing suits against the John Doe defendants "until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials."  *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998).  Plaintiff's interest in conducting discovery is particularly pronounced here, where he is incarcerated and has little to no ability to determine the identities of the Doe officers on his own.  Therefore, I decline to dismiss his claims against the Doe Defendants at this point on this ground; however, Plaintiff will ultimately be required to identify each defendant by name, so that they may be served and provided the opportunity to defend themselves.[15]  *See Regeda v. City of New York*, No. 09-CV-5427 (KAM)(VVP), 2012 WL 7157703, *8 (E.D.N.Y. Sept. 7, 2012).

_____

[15] Any attempt to name these John Doe officers will be subject to the three-year statute of limitations applicable to § 1983 cases filed in New York.  *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002).  However, under certain circumstances, a plaintiff who initially names a defendant as a John Doe because he does not know the defendant's true identity may later substitute in a named party, even after the statute of limitations has run out.  *Hogan v. Fischer*, 738 F.3d 509, 519 (2d Cir. 2013); Fed. R. Civ. P. 15(c)(1)(A); N.Y. C.P.L.R. § 1024 (New York's John Doe procedural rule).  Section 1024 provides that "A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known.  If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly."  "New York courts have interpreted this section to permit John Doe substitutions nunc pro tunc."  *Hogan*, 738 F.3d at 518–19 (collecting cases).  To take advantage of § 1024, a plaintiff must (1) "'exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name,'" and (2) "describe the John Doe party 'in such form as will fairly apprise the party that he is the intended defendant.'"  *Hogan*, 738 F.3d at 519 (quoting *Bumpus v. N.Y.C. Transit Auth.*, 883 N.Y.S.2d 99, 104 (2d Dep't 2009), and finding that plaintiff satisfied the second prong by "describe[ing] with particularity the date, time, and location of the alleged spraying incident" and providing "substantial detail concerning the appearance of his alleged assailants.")

Finally, Defendants argue that the Doe Defendants are entitled to qualified immunity, but their argument and the authority they cite relate only to Plaintiff's First Amendment claim, not his Fourth Amendment claim.  (*See* City Mem. 14–15.)  In any event, as discussed above, it is clearly established Second Circuit law that it is unconstitutional to conduct a second strip search shortly after a first strip search, where the inmate has been supervised for the intervening time and has had no opportunity to obtain or conceal contraband.  *Hodges*, 712 F.2d at 35; *Vasquez*, 2015 WL 4757657, at *5 ("[T]he right against such a second search was clearly established" on the occasions plaintiff was subject to unreasonable redundant strip searches from 2012 to 2014).  Therefore, I cannot conclude that qualified immunity should apply to bar Plaintiff's claims against the Doe Defendants at this stage, based on the facts alleged in the complaint.  *See Bradshaw*, 2018 WL 818316, at *6 n. 8 (finding on summary judgment that defendant officers who conducted redundant second strip search were not entitled to qualified immunity); *Vasquez*, 2015 WL 4757657, at *5 (same).  This finding at this stage of the litigation is not and should not be construed as a finding that as a matter of law qualified immunity does not apply.

b. <u>Commissioner Ponte</u>

Plaintiff has alleged that (1) Ponte "instituted an unconstitutional Department wide policy for illegal body cavity strip-frisk-searches," (Compl. ¶ 12), and (2) that the John Doe Correction Officers, in conducting strip searches that were unlawful because they were not reasonably related to a legitimate security interest, informed Plaintiff that they were doing so pursuant to "the new policy handed down from the Commissioner," (Compl. ¶¶ 45, 51).  While it is not clear from this allegation what "the new policy" required the officers to do, at the motion to dismiss stage it is reasonable to infer that the officers would have been referring to their diversion of the bus to the search facility and subsequent strip search of the inmates on the bus, while going to

the courthouse from a correctional facility, here GMDC.  Therefore, these non-conclusory allegations adequately plead that Defendant Ponte was personally involved in the purported Fourth Amendment violations because he "created a policy or custom under which unconstitutional practices occurred," satisfying the third factor of the *Colon* test.  58 F.3d at 873.

### c.   Municipal Liability

Within the context of a *Monell* claim, "[o]fficial municipal policy includes not only the decisions of a government's lawmakers, but also the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (internal quotations omitted).  "Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved."  *Jeffes*, 208 F.3d at 57.  This determination is made on the basis of state law.  *Id.*

Defendant Ponte, as Commissioner of the Department of Corrections, was endowed with "[a]ll authority, except as otherwise provided by law, concerning the care and custody of felons, misdemeanants and violators of local laws held in the institutions under his charge."  N.Y. City Charter § 623(4).  He also possessed the "[s]ole power and authority concerning the care, custody and control of all court pens for the detention of prisoners while in the criminal courts of the city of New York, the family court of the state of New York within the city of New York, the supreme court in the counties of New York, Bronx, Kings, Queens and Richmond and of all vehicles employed in the transportation of prisoners who have been sentenced, are awaiting trial or are held for any other cause."  *Id.* § 623(2).  Consequently, at this stage, it is plausible to infer

that Defendant Ponte, as head of the Department of Corrections, was the final policymaking

official with respect to strip search policies between GMDC and the courts.  *Cf. Weber v. Dell*,

804 F.2d 796, 803 (2d Cir. 1986) (finding county liability for  where sheriff was the policy

maker "as it relates to strip search" and describing *Blackburn v. Snow*, 771 F.2d 556, 571 (1st

Cir. 1985) as holding that "where sheriff was responsible for promulgating security policies for

correction facilities, there could hardly be a clearer case of county liability for damage caused by

strip search rule" (internal quotation marks omitted)); *Francis v. City of New York*, No. 17 Civ.

1453 (LAK)(HBP), 2018 WL 4659478, at *7 (S.D.N.Y. Aug. 21, 2018) (plaintiff stated a claim

against the City of New York based on a written policy of the Department of Corrections); *White

v. City of New York*, No. 13 Civ. 7421(KPF), 2015 WL 4601121, at *8 (S.D.N.Y. July 31, 2015)

(plaintiff stated claim of deliberate indifference against the City of New York based on

allegations that "as a result of their poor training, inexperience, and inadequate supervision,

correction officers at Rikers Island engaged in a practice of using excessive force against inmates

in deliberate indifference of the inmates' constitutional rights").

Accordingly, by alleging that (1) he was unlawfully strip searched in violation of the

Fourth Amendment (2) pursuant to a policy promulgated by Ponte, (3) that was implemented by

at least two teams of corrections officers on different days, and (4) that these officers explicitly

stated they were following a policy, Plaintiff has adequately pled that a formal municipal policy

caused his constitutional injury.

### D.  *First Amendment Claim of Improper Strip Search*

#### 1.  **Applicable Law**

An incarcerated person's right to free exercise of his religion must be balanced against

the "interests of prison officials charged with complex duties arising from administration of the

penal system." *Brandon v. Kinter*, 938 F.3d 21, 32 (2d Cir. 2019) (internal quotation marks

omitted).  Courts therefore assess constitutional free exercise claims brought by prisoners under a

"reasonableness" test.  *Id.*  First, a prisoner must show "that the disputed conduct substantially

burdens his sincerely held religious beliefs."  *Id.* (internal quotation marks omitted).  If he

"satisfies these threshold requirements, a defendant can still avoid liability by showing that his or

her conduct is reasonably related to legitimate penological interests."  *Id.*  Therefore, under this

framework, a strip search "that impinges on a prisoner's freedom of religion must be rationally

related to a legitimate penological interest to survive First Amendment scrutiny."  *Wilkerson*,

438 F. Supp. 2d 318, 324 (S.D.N.Y. 2006).

## 2.  Application

Plaintiff asserts that because he "[is] registered under the Jewish faith and [is] not

supposed to disrobe in the presence of other inmates," the strip searches on April 15 and 22,

2015 violated his freedom of religion under the First Amendment.  (*See* Compl. ¶ 48, 53.)

Defendants do not appear to dispute, and therefore concede for the purposes of this motion,

*see Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, No. 11 Civ. 3327(ER), 2013 WL

417406, at *13 (S.D.N.Y. Feb. 4, 2013), that the strip searches substantially burdened Plaintiff's

sincerely held religious beliefs.  (City Mem. 12.)  Instead, Defendants argue only that the strip

searches did not violate Plaintiff's First Amendment rights because they were "rationally related

to [the] legitimate penological interest" of preventing the smuggling of contraband.  (City Mem.

12.)  In addition, as with Plaintiff's Fourth Amendment claim, Defendants argue that the Doe

Defendants are entitled to qualified immunity, and that Plaintiff has not adequately alleged the

personal involvement of Defendant Ponte or a municipal policy or custom.  (*Id.* 11–16.)

a.  Doe Defendants

As I have already held, Plaintiff has adequately alleged that the second strip searches on April 15, 2015 and April 22, 2015 were not reasonable because following the first strip search, he was continuously supervised and had no opportunity to obtain contraband.  Therefore, "because [Plaintiff's] second strip search as alleged furthered no legitimate penological goal, [he] has properly pled that [the officers] violated his First Amendment religious rights by conducting the second search."  *Wilkerson*, 438 F. Supp. 2d at 324.  For the same reason, I cannot find at this stage that Defendants are entitled to qualified immunity because "it was clearly established at the time of the alleged violations that prison officials may not substantially burden inmates' right to religious exercise without some justification."  *Salahuddin*, 467 F.3d at 275–76.

Defendants' argument that the Doe corrections officers are entitled to qualified immunity misconstrues both the nature of Plaintiff's claim and the law.  Defendants contend that the officers are protected because there is no precedent clearly establishing that forcing a religious inmate to disrobe in the presence of other inmates or in the presence of female police officers violates his First Amendment rights.  (City Mem. 14–15.)  This is true, as far as it goes; as Defendants point out, several district courts have indeed found that qualified immunity barred First Amendment claims by religious inmates alleging that they were forced to be naked or partially naked in front of female officers.  None of the cases cited by Defendants, however, addressed whether officers were liable for strip searches conducted on religious inmates that were, as a matter of law, without a legitimate penological purpose, and so they do not control here.  In *Jean-Laurent v. Lawrence,* No. 12 Civ. 1502(JPO)(SN), 2013 WL 1129813, at *8 and *Woodward v. Perez*, No. 12 CV. 8671(ER), 2014 WL 4276416, at *7 (S.D.N.Y. Aug. 29, 2014),

the district courts found that qualified immunity protected defendant officers because "no case law from the United States Supreme Court or the Second Circuit Court of Appeals supports the theory that it violates a Muslim inmate's constitutional rights to be searched in his underwear in the presence of a female officer." *Woodward*, 2014 WL 4276416, at*7.  The district courts did not directly decide or analyze whether there was a legitimate penological purpose for the officers' actions, but they also did not recount any allegations by the plaintiff that would even arguably support such a finding.  In *Holland v. City of N.Y.*, 197 F. Supp. 3d 529, 537–45 (S.D.N.Y. 2016), the district court granted qualified immunity to defendant because "there was no clearly established rule that, *during a lockdown or other exigent situation*, a correction officer is prohibited from conducting a strip search and viewing the private parts of a Muslim inmate of the opposite sex."  (emphasis added).  In so holding, the court observed that "the courts in this Circuit . . . that have discussed the rights of Muslim inmates to not be viewed in the nude by the opposite sex suggest that emergency or exigent circumstances may provide a legitimate penological interest justifying the infringement upon the inmate's free exercise of religion."  *Id.*

Here, it is well established that redundant strip searches are, as a matter of law, *not* justified by a legitimate penological interest, *Hodges*, 712 F.2d at 35, and that "prison officials may not substantially burden inmates' right to religious exercise without some justification." *Salahuddin*, 467 F.3d at 275–76.  Therefore, because there is no dispute as to whether plaintiff's religious exercise was burdened, and "because [I] hold[] that plaintiff has plausibly alleged that defendants . . . at this time, have not established a legitimate penological justification, defendants are not entitled to qualified immunity on the premise that their conduct did not violate clearly established law."  *Rossi v. Fishcer*, No. 13-cv-3167 (PKC)(DF), 2015 WL 769551, at *18 (S.D.N.Y. Feb. 24, 2015) (concerning free exercise claims based on defendants' denial of

plaintiff's requests for certain special accommodations on Rastafari holy days, the ability to hold Friday Sabbath services, and permission to wear his religious turban); *see also Diggs v. Marikah*, No. 11 Civ. 6382(PAE), 2012 WL 934523, at *5 (S.D.N.Y. Mar. 20, 2012) (qualified immunity unavailable because "[w]hether defendants . . . could have reasonably believed that denying plaintiff access to congregate religious services did not violate an established constitutional right depends [], at this stage, on whether, on the facts alleged in the Complaint, they had a reasonable basis to believe that that denial served a legitimate penological interest.")

Therefore, because at this stage, I cannot conclude that a reasonable "officer [would have] reasonably believe[d] that his or her conduct complie[d] with the law," *Pearson*, 555 U.S. at 244, Defendants' motion to dismiss this claim on the basis of qualified immunity must be denied.

         b.   <u>Liability of Commissioner Ponte and the City of New York</u>

In the context of Plaintiff's Fourth Amendment claim, I have already found that he has sufficiently alleged that Ponte, a final policymaker, "created a policy or custom" under which the second strip searches on April 15 and 22, 2015 occurred.  *See Colon*, 58 F.3d at 873.  Therefore, to the extent that these strip searches violated Plaintiff's First Amendment rights, Plaintiff has sufficiently alleged that Defendant Ponte and the City of New York are liable for them.[16]

**E.  *Punitive Damages***

Defendants ask me to dismiss Plaintiff's request for punitive damages on the grounds that (1) punitive damages may not be awarded against individuals sued in their official capacity and (2) because even in their individual capacity, Defendants are not alleged to have acted

---

[16] I note again that Defendants do not argue that Plaintiff did not have a sincerely held religious belief, or that belief was not substantially burdened.  They also do not argue that Defendant Ponte should be protected by qualified immunity.  Accordingly, I do not address the validity of these contentions.

maliciously.  (City Mem. 19.)

Defendants are correct that claims against individuals sued in their official capacity are effectively claims against the governmental entity for which they serve as agent, *Lore v. City of Syracuse,* 670 F.3d 127, 164 (2d Cir. 2012), and punitive damages are not available against government entities, *Newport v. Fact Concerts*, 453 U.S. 247 (1981).  Nevertheless, "[a] motion to dismiss is addressed to a 'claim'—not to a form of damages." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010) (citation and internal quotation marks omitted). "Because punitive damages are a form of damages, not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is 'procedurally premature.'" *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019) (citation omitted).

Accordingly, Defendants' motion to dismiss Plaintiff's request for punitive damages is denied.

### F.  *Dismissal Without Prejudice*

Claims brought pro se typically are dismissed without prejudice.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (unless there is no indication that the pro se plaintiff will be able to assert a valid claim giving rise to subject matter jurisdiction, leave to amend should be given).  "A pro se complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks omitted).  I see no reason to deviate from the normal practice in this case.

Accordingly, Plaintiff's Eighth Amendment claim against Ponte is dismissed without prejudice.

36

V.   **Conclusion**

For the foregoing reasons, Defendant Segal's motion is DENIED and the City Defendants' motion is GRANTED IN PART and DENIED IN PART.  Plaintiff's Eighth Amendment claim against Defendant Ponte is dismissed without prejudice.  The following claims survive:  Plaintiff's Eighth Amendment claim against Defendants Segal, Davydov, and the City of New York; and Plaintiff's Fourth and First Amendment claims against the John Doe correction officers, Ponte, and the City of New York.

Within thirty (30) days of this Opinion & Order, Plaintiff shall submit a letter informing me whether he seeks to proceed with any or all of his claims against those Gauvin, Liburd, and Villalobos, and setting forth the allegations supporting those claims.  Within thirty (30) days of receiving that letter, the City Defendants shall submit a response detailing (1) their position on whether the claims identified by Plaintiff should be reinstated, along with any supporting factual and legal authority; (2) whether, if those claims are reinstated, the New York City Law Department would represent the new defendants; and (3) if the Law Department intends to represent those Defendants, whether they will waive service and whether they need to take any additional discovery.

The post-discovery conference currently scheduled for April 9, 2020, is adjourned sine die pending resolution of the above listed issues.

The Clerk of Court is directed to terminate the motions at Documents 36 and 53.


SO ORDERED.

Dated: April 2, 2020
        New York, New York

Vernon S. Broderick
United States District Judge